UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DELBERT CHARLES COBB,

Petitioner,

v.

E.K. MCDANIELS,[1] et al.,

Respondents.

Case No. 3:15-cv-00172-MMD-CSD

ORDER

## I.  SUMMARY

Petitioner Delbert Charles Cobb, an individual incarcerated at Ely State Prison, was sentenced in Eighth Judicial District Court (Clark County) to life without the possibility of parole after a jury found him guilty of first-degree murder with use of a deadly weapon, attempted murder with use of a deadly weapon, and conspiracy. (Exh. 123, ECF No. 24-7.) Cobb filed a second-amended petition for writ of habeas corpus under 28 U.S.C. § 2254 alleging several claims of trial court error and ineffective assistance of counsel. (ECF No. 17 ("Petition").) Respondents have answered. (ECF No. 117.)[2] For the reasons discussed below, the Court denies the remaining claims in Cobb's Petition and denies a certificate of appealability.

---

[1]According to the state corrections department's inmate locator page, Cobb is incarcerated at Ely State Prison. The department's website reflects W.A. Gittere is the warden for that facility. At the end of this order, the Court directs the clerk to substitute W.A. Gittere for prior Respondent E.K. McDaniels, under, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

[2]Cobb filed a reply in support of the Petition. (ECF No. 120.)

1

2
## II.   BACKGROUND

3        In May 2007, following a ten-day jury trial, Cobb was convicted of the murder and

4 attempted murder charges. (Exh. 123, ECF No. 24-7.) The charges related to four

5 different gang-related shootings in Las Vegas that occurred when Cobb was 16 years old.

6 (ECF No. 17 at 5-16.) Cobb had previously pleaded guilty to two of the shootings, both of

which were non-fatal.

7        He pleaded guilty to shooting Jose Silva on November 4, 1999 and to shooting

8 Carlos Venegas on December 11, 1999. This trial involved two incidents—he was

9 charged with first-degree murder for the November 13, 1999 murder of Juan Lopez, Sr.,

10 and he was charged with the attempted murder of his son, Juan Lopez, Jr. The second

11 first-degree murder charge was for the December 16, 1999 murder of Jorge Contreras.

12 The jury found Cobb guilty of murder and attempted murder for the Lopezes and not guilty

13 of the Contreras murder. (Exh. 123, ECF No. 24-7.)

14        After a two-day penalty phase, the jury sentenced Cobb to life in prison without the

15 possibility of parole. (Exh. 127, ECF No. 24-11.)[3] Judgment of conviction was entered in

16 September 2007. (Exh. 133, ECF No. 24-17.) The Nevada Supreme Court affirmed his

17 convictions in July 2010 and affirmed the denial of his state postconviction petition for a

18 writ of habeas corpus in May 2014. (Exh. 156, ECF No. 25-5; Exh. 206, ECF No. 28-5.)

19        Cobb dispatched his original federal habeas petition for filing in March 2015. (ECF

20 No. 5.) The Court appointed the Federal Public Defender as counsel for Cobb. (ECF No.

21 4.) In March 2017, the Court granted Respondents' motion to dismiss in part, concluding

22 that several grounds were unexhausted. (ECF No. 66.) In March 2018, the Court granted

23
_____

24        [3]The Nevada legislature enacted NRS § 213.12135 in 2015, which automatically converted Cobb's sentence to life with the possibility of parole after 20 years because he
25 was a juvenile at the time of the crime. The Nevada Department of Corrections website reflects that Cobb, whose Offender ID is 64849, is currently serving a sentence of life with
26 the possibility of parole after 20 years. *See* https://ofdsearch.doc.nv.gov/form.php (last accessed 9/27/2023).

27                                                                                      2

28

1 | Cobb's motion for a stay and abeyance pending the resolution of his state-court litigation.
2 | (ECF No. 77.)

3 | Cobb pursued a second state postconviction petition. The state district court found
4 | that Cobb's second petition was procedurally barred because it was untimely and
5 | successive. (*See* Exh. 208, ECF No. 80-1.) In March 2021, the Nevada Court of Appeals
6 | affirmed. (*Id.*) This Court granted Cobb's motion to reopen his federal petition in July 2021.
7 | (ECF No. 82.)

8 | Respondents filed a motion to dismiss certain claims from the second-amended
9 | petition. (ECF No. 85.) The Court granted the motion in part and denied it in part. (ECF
10 | No. 110.) The following claims remain before the Court for adjudication on the merits:

11 |
12 | **Ground 1**: The prosecution used its peremptory challenges to remove African American jurors in a racially discriminatory manner, in violation of the right to an impartial jury and to equal protection under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.
13 |

14 | **Ground 2**: Trial counsel was ineffective for failing to object when the state district court dismissed the African American prospective jurors before holding a hearing to assess whether the prosecution dismissed them with discriminatory intent in violation of the Fifth, Sixth, and Fourteenth Amendments.
15 |
16 |

17 | **Ground 4**: Trial counsel was ineffective for failing to object to the state district court's effective denial of Cobb's motion to strike the jury venire after an evidentiary hearing was granted, but before conducting the hearing in violation of the Fifth, Sixth, and Fourteenth Amendments.
18 |

19 | **Ground 6**: Cobb was denied his right to confront a witness against him when the state district court improperly admitted Contreras's purported identification of Cobb as the shooter, in violation of the Fifth, Sixth, and Fourteenth Amendments.
20 |
21 |

22 | **Ground 8**: Trial counsel ineffectively failed to adequately investigate victim Lopez, Jr. who would have testified Cobb did not shoot him or his father, in violation of the Fifth, Sixth, and Fourteenth Amendments.
23 |

24 | **Ground 9**: Trial counsel ineffectively failed to object to the testimony of Officer Hollis, an expert witness the prosecution failed to properly notice, in violation of the Fifth, Sixth, and Fourteenth Amendments.
25 |

26 |

27 | 3
28 |

**Ground 10**: Trial counsel ineffectively failed to request a spoliation of evidence instruction, in violation of the Fifth, Sixth, and Fourteenth Amendments.

**Ground 11**: Trial counsel was ineffective for failing to object to the hearsay testimony of Angel Melendez, in violation of the Fifth, Sixth, and Fourteenth Amendments.

**Ground 12**: Cobb was denied his right to confront the witnesses against him when the state district court admitted the preliminary hearing testimony of Angela Orozco, in violation of the Fifth, Sixth, and Fourteenth Amendments.

**Ground 14**: The cumulative effect of the errors at trial violated Cobb's right to due process, in violation of the Fifth, Sixth, and Fourteenth Amendments.

(ECF No. 17.)

## III.   AEDPA STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision

4

is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

To the extent that the petitioner challenges the state court's factual findings, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *See, e.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a mere showing that the state court finding was "clearly erroneous." *Lambert*, 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

5

1
2
3

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

4    *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

5    Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be

6    correct unless rebutted by clear and convincing evidence. The petitioner bears the burden

7    of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*,

8    563 U.S. at 181.

9    ## IV.    TRIAL TESTIMONY[4]

10   ### *Cobb pleaded guilty to November 4, 1999 shooting of Jose Silva*

11   The State subpoenaed Angel Melendez, who was serving a prison term. (Exh. 112

12   at 92-122, 152-184, ECF No. 22-1.) He said that he remembered very little about the

13   events over seven years earlier on November 4, 1999. So the State showed him his one-

14   page statement that he had handwritten at the time, when he was 15 years old. He

15   testified that he was on the sidewalk at Ogden and 21st streets in Las Vegas that night.

16   He acknowledged that his police statement reflected that he told them that a Black

17   individual appeared; he was dark-skinned, about 5'5" or 5'6", 150-155 pounds. The

18   individual said something, but all Melendez heard was "gang." Melendez saw the

19   individual reach for something from his pants and start shooting. Melendez's friend's

20   uncle told him to get down, and Melendez then heard what sounded like about five

21   firecrackers. Jose Silva was at the scene and was shot and wounded. Melendez chose

22   Cobb from a police photo line-up; but he testified at trial that he "picked it randomly." (*Id.*

23
24
25
26

[4]The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record. The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering Cobb's claims.

27                                                    6

28

at 102.) He acknowledged that he did not testify willingly, and that it was not good to be known in prison as a snitch. On cross-examination, Melendez said that that night he was just hanging out with friends and that no one belonged to a gang. He said that when the police came to his house with the photo lineup, his mother was distraught, and he felt pressured by the police to pick a photo.

Cobb, who is African American, took the stand and testified about events culminating in the Silva shooting. (Exh. 117 at 124-133, 145-146, 153-184, ECF No. 22-6.) He said that he and his classmate Miguel arrived one morning at their high school and parked. He was 16 years old, had recently returned to Las Vegas from Elko where he had been attending high school, and had transferred to Desert Pines High School in Las Vegas. Students in a truck next to them argued with Cobb because they said Cobb parked in their friend's spot. Cobb refused to move, and they had a verbal disagreement. Later during the school day, Cobb went to the restroom. Two or three guys jumped him, hitting him several times. He didn't know who they were. A couple of days later on November 4, he and Miguel were driving home late at night when they saw the truck. They drove to Angela Orozco's house; she slid a Remington rifle out of her window. They drove back to where the truck was parked and Cobb "shot up the truck." Angel Melendez was there; Jose Silva was shot. They drove back to Orozco's house, and Cobb slid the rifle back in her window, jumped back into the car, and was dropped off at home.

### *Cobb pleaded guilty to December 11, 1999 shooting of Carlos Venegas*

Cobb testified that on December 11, he was hanging out at a girl named Robin's apartment with five to six other people. (Exh. 117 at 143-184, ECF No. 22-6.) A person he came to know was Carlos Venegas came to the apartment. Cobb estimated that Venegas was around 20 years old. Venegas only spoke Spanish; Cobb doesn't speak Spanish. Venegas was drunk. Robin said that he was the ex-boyfriend of another girl who was present, Melissa, and that he wouldn't leave her alone. Melissa was 14 years old.

7

Cobb told Venegas something like "When I'm here, don't come here." (*Id*. at 148.) The situation escalated to a brief fistfight. Venegas left, crossed the street, and went into some apartments. Later that night, Cobb saw a bunch of people hanging out on the side of the apartments. Cobb felt vulnerable after the altercation. He couldn't really see the people in the dark, so he called out, "Who are you guys, where are you guys from?" (*Id*. at 150.) Venegas started walking straight toward the van. Cobb knew the Remington rifle was in the van; he pointed it out the window and fired a couple of times, hitting Venegas in the face. Cobb never saw the Remington rifle after that night.

### *November 13, 1999 shootings of Juan Lopez Sr. and Juan Lopez, Jr.*

Las Vegas Metropolitan Police ("Metro") officer Collin Jotz testified that he responded to a shooting by a convenience store at about 11:30 p.m. (Exh. 112 at 162-182, ECF No. 22-1.) He and his partner arrived to find a Hispanic male lying on his back in front of the store. Jotz noticed blood around the victim's neck and chest; he appeared to have gunshot wounds. Jotz could see air bubbles coming through the hole in his throat where he was shot, and he seemed panicked and to be having difficulty breathing. The officer recalled the individual was wearing a white jersey bearing the number 13. Jotz asked him what happened and who was responsible. The victim was having an increasingly hard time breathing but said he was "shot by a 28th Street," which Jotz understood based upon his training and experience to be a member of the 28th Street gang. (*Id*. at 173.) Refreshing his memory from his police report, Jotz said that the individual told him he was with his father a short distance away from the store when a white van approached and opened fire on them.

The State subpoenaed Juan Lopez, Jr. to testify at Cobb's 2007 trial. (Exh. 113 at 14-29, ECF No. 22-2.) Lopez was incarcerated in California at the time of the trial for assault with a firearm. In response to questions from the State, Lopez had said that he did not remember the incident in November 1999, when he was shot, and his father was

8

shot and died of his injuries. The court then permitted the prosecutor to treat Lopez as an adverse witness and ask him leading questions about a previous deposition and statements Lopez gave to police at the time of the shootings. Lopez claimed that he did not remember telling police that he had been at a convenience store with his dad when a white Chevy Astro van pulled up and an individual who was Black and white (*i.e.*, mixed race), wearing a Dallas Cowboys hat and blue and white jacket, got out of the passenger seat. The prosecutor asked Lopez if he remembered when the van driver asked him and his father where they were from—meaning their gang affiliation—and that after they answered the passenger then fired numerous shots at the pair. He also asked Lopez if he recalled telling a police officer after Lopez had been shot several times that it was the 28th Street gang who shot him. Lopez denied remembering the events.

Cobb testified that the night of the Lopez shootings, a fellow gang member known as Sniper picked up Cobb in a white Astro van. (Exh. 117 at 132-143, ECF No. 22-6.) Cobb estimated that Sniper was in his early to mid-20's. Cobb planned to go to an amusement park called Scandia, where a lot of his classmates worked. As they drove, they saw Juan Lopez, Jr. wearing a "13" jersey. Sniper asked Lopez where he was from, and he replied Little Watts, California. Sniper turned into an alley and parked. They smoked marijuana, and Cobb caught up with a friend who was sitting in the back seat, telling him about Elko, etc. They saw Lopez cross back over the street in the alley. Sniper drove out of the alley and came up alongside Lopez. Sniper threw the van in park and retrieved a rifle that had been wedged between the center console and the seat. Cobb had seen the rifle before but didn't know it was in the van at that time. Sniper went out the side door of the van. Cobb was pretty high and was experiencing tunnel vision. Shots were fired, and Cobb saw Lopez take off running. Cobb testified that if he had tried to stop Sniper from shooting that he would have been killed for being disloyal.

Bruce Snell testified that he was retired but had formerly worked as a parole and probation officer for Nevada Parole and Probation and would investigate and write presentence investigation reports. (*Id*. at 102-108.) He interviewed Cobb in March 2000. With respect to the Lopez shootings, Cobb told Snell that he was only a passenger in the van, he was not carrying a gun, and he didn't know someone was going to be shot. He said that members of his gang, 28th Street, were shooting at members of 213, a rival gang from Los Angeles.

### *December 16, 1999 shooting of Jorge Contreras*

Beatriz Hernandez testified that she was Jorge Contreras's girlfriend. (Exh. 114 at 45-80, ECF No. 22-3.) They started dating when she was a freshman or sophomore in high school; Contreras was out of high school. She said that about five months before the shooting, she was walking to meet Contreras and saw him talking to an African American individual. When she reached them, the guy got in a car and left. She asked Contreras what that was about. He said that was someone named Shady who asked what gang Contreras was from. Contreras replied that he was not in a gang and that was the end of the conversation. Hernandez had never met or seen the person before. Contreras said he and Shady had attended the same middle school. Her neighborhood had a lot of graffiti, and while she didn't know Shady, she had frequently seen graffiti that said "Shady" together with "28th Street." There was a graffiti tag like that within a block from where Contreras was shot on December 16, 1999. Hernandez rushed to the scene, but Contreras had been taken to the hospital. She spoke at length with a female police officer there. Two or three days later, she was allowed to see Contreras in the trauma unit. He was unrecognizable and in a coma. About a week and a half later he started to regain consciousness. His left side was paralyzed, and he couldn't speak because he had a tube down his throat. They would communicate by writing and gestures. His father was with them in the hospital room one day and expressed concern that he did not know who shot

10

his son. Hernandez asked Contreras "who did this to you?" Contreras looked at her. She asked, "Shady? Did Shady do this to you?" And Contreras pointed at her.[5] Hernandez then left the room and called the detective on the case. Contreras was recovering, started to be able to speak, and was moved to a rehabilitation facility. He died suddenly weeks after the shooting of a pulmonary embolism related to his injuries.

The court asked a juror's question, "How was he pointing at you? Like to say that's right or to get your attention for something else?" Hernandez answered, "Saying that's right." Another juror submitted the question, "Why did you immediately ask if it was Shady who did it?" Hernandez responded that she had had a conversation with the police officer the night of the shooting who described the shooter's race. She never saw a graffiti tag with "Shady" and "28 Street" again after the shooting. In response to questioning by the State, Hernandez said that prior incidents, together with the race of the suspect and the graffiti prompted her to ask Contreras if it was Shady.

Cobb testified that he was not involved in shooting Contreras. (Exh. 117 at 151-152, ECF No. 22-6.) He said that at the time, he lied to police and said Jose Devora was the perpetrator because he knew Devora could prove that he was out of town on December 16. Cobb acknowledged on cross-examination that he did not know any other 28th Street gang member who was Black.

Jose Devora testified that during the time period in question, November to December 1999, he was 16 years old, lived in Las Vegas and was a member of the 28th Street gang. (*Id*. at 90-108.) He said that the gang frequently passed different guns around. The State had Devora read the statement he made to police at the time. The police asked him if he'd ever seen Shady with a gun, and he answered that he saw Shady

---

[5]At the end of her testimony, the State asked Hernandez to demonstrate the manner in which he pointed at her and said, "may the record reflect the witness has extended her hand and repeatedly pointed at the speaker. (Exh. 114 at 80, ECF No. 22-3.)

with a .22 caliber rifle. Devora testified that he had lied in that statement because he felt pressured and threatened by police. Devora also acknowledged that at the time, Cobb had told police that Devora was the shooter in two incidents. Devora testified that he knew Cobb lied, so in retribution Devora lied about Cobb.

Byron Wilson testified that he is a Black and Hispanic male and a member of the 28th Street gang. (Exh. 117 at 108-120, ECF No. 22-6; Exh. 118 at 48-55, ECF No. 22-7.) He testified that at the time in question the gang was made up of many different races, African American, Hispanic, mixed race. He also said he had known Shady for many years. In 1999, Wilson knew of two other individuals in the 28th Street gang who went by Shady. One was a dark-skinned, African American, and he knew him only by his first name, Chris.

Alfred Jones testified that he was a member of the 28th Street gang in 1999. (Exh. 119 at 41-47, ECF No. 23.) He said he knew Delbert Cobb as Shady. He also knew another person who went by Shady, a dark-complected African American. Jones did not know his full name; he said the person went by Chris.

David Hollis testified that he was originally from Los Angeles, where he had been a gang member from about 1976-1982. (Exh. 114 at 132-162, ECF No. 22-3.) He moved to Las Vegas to attend college. At the time of trial he had worked in youth parole for 10 years. His caseload consisted of serious, violent offenders. He had 400-500 hours of training with gangs and was a member of the Nevada Gang Investigators Association. He worked with Los Angeles Police Department gang officers and Metro youth gang officers. Hollis stated that Cobb was a member of the 28th Street Gang in 1999 and went by the moniker "Shady." Police detectives contacted Hollis on December 22, 1999 and explained that they were interested in speaking with Cobb. Hollis met detectives at Cobb's home. Hollis testified that:

12

1
2
3

> [Cobb] just looked at me, kind of put his head down. He said I was trying to do the best I could on parole, but if . . . I didn't do what I had to do for the hood, they were going to get me. . . . . He said I'm sorry Mr. Hollis, I was trying to do the right thing. But if I didn't put in the work, they were going to– they were going to go do me.

4   (*Id*. at 149.)

5   Hollis explained that "put in the work" can mean several different things, including

6   fighting, shooting, robbing, and selling drugs. "Putting in the work is kind of a whole group

7   of things that you can pick and choose from that you actually do to further the gang culture

8   and further your gang."

9   **V.      CLAIMS REJECTED ON DIRECT APPEAL**

10         **A.      Ground 1**

11   Cobb claims that the State used its peremptory challenges in a racially

12   discriminatory manner to remove African American jurors in violation of the right to an

13   impartial jury and to equal protection under the Fifth, Sixth, Eighth, and Fourteenth

14   Amendments. (ECF No. 17 at 19-30.)

15   Race-based peremptory challenges to excuse prospective jurors violate the Equal

16   Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79

17   (1986). The Supreme Court prescribed a three-step procedure in reviewing a *Batson*

18   claim: (1) the petitioner must make out a prima facie case "by showing that the totality of

19   the relevant facts gives rise to an inference of discriminatory purpose"; (2) the "burden

20   shifts to the State to explain adequately the racial exclusion by offering permissible race-

21   neutral justifications for the strikes"; and (3) "[i]f a race-neutral explanation is tendered,

22   the trial court must then decide . . . whether the opponent of the strike has proved

23   purposeful racial discrimination." *Johnson v. California*, 545 U.S. 162, 168 (2005) (internal

24   quotations and citations omitted). This is because the three-step review process is not

25   intended "to be so onerous that a defendant would have to persuade the judge—on the

26   basis of all the facts, some of which are impossible for the defendant to know with

27                                          13

28

certainty—that the challenge was more likely than not the product of purposeful discrimination." *Id*. Rather, to satisfy the first step, the defendant must produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id*. at 170. A defendant may rely on "any other relevant circumstances" to support an inference of discriminatory purpose. *Id*. at 169. The United States Court of Appeals for the Ninth Circuit has held that statistical disparity can raise a prima facie case. *Williams v. Runnels*, 432 F.3d 1102, 1107-10 (9th Cir. 2006) In *Johnson*, the court emphasized that a defendant need only show "an inference of discriminatory purpose" and could not be required to show that a "challenge was more likely than not the product of purposeful discrimination." 545 U.S. at 170.

More recently, the Supreme Court reiterated the *Johnson* holding:

> But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). To "rebut an inference of discriminatory purpose based on statistical disparity, the 'other relevant circumstances' must do more than indicate that the record would support race-neutral reasons for the questioned challenges." *Williams*, 432 F.3d at 1108.

Here, the State struck the only two African Americans in the jury pool. (*See* Exh. 111 at 182, 266, ECF No. 22.) Defense counsel Bret Whipple challenged the State's using a peremptory strike to remove Juror Carter under *Batson*:

> Whipple: Well, I'm going to put the burden on them. I think obviously at this point they need to find a race neutral. I will say, however, that I believe— and I'm—that out of an abundance of caution, I want to make a record— . . . that, in fact, the reason that they ever raised the issue with Ms. Carter to begin with was to—was to—was pre (indiscernible) essentially. And the fact that they were trying to show that there's something improper with her I think, in fact, if you look at her jury questionnaire she's right down the middle

14

of the road. And my concern is the only reason they're striking her or challenging, or using their preempt is because she's African American, Your Honor.

The State responded that the defense bore the burden to establish some sort of racial discrimination. The State then deferred to the court. Defense counsel continued, and then the court rejected the challenge:

> Whipple: . . . the record is, is there's two African American in the entire group of 35, and they're now going to use their preempts on one of them.
>
> Court: Well, here's the thing. Just because the District Attorney's Office chooses to preempt an African American does not, on—you know, automatically establish some racial process to exclude, based upon race. This woman's son has been sent to prison by the District Attorney's Office. It doesn't matter what race she is. That right there is a red flag for any prosecutor who may or may . . . not wish to preempt someone. That's the first thing.
>
> The other thing is, interestingly, while I agreed with the defense that it was certainly not—did not rise to the level of challenge for cause, her comments about the victim in the questionnaire seemed to suggest that she sees her son as a victim. But then today she's like, "Well, he did the crime, he needs to pay, and he needs treatment, and this and that."
>
> That again, from a prosecutor's standpoint, is a perfectly rational and reasonable and appropriate basis to be concerned that she will have certain sympathies that might not ordinarily exist in your regular juror.
>
> So I understand the basis and the fact that she's African American, but that's about it. And everything else points to the State excluding her appropriately on a preempt because their office put her son in prison. Their office has apparently prosecuted him more than once, and she sees her son as a victim in the questionnaire. . . .
>
> Whipple: I stand by my challenge while I recognize the Court's position.
>
> Court: Well, I would not sustain that challenge. That would be denied . . . .

(Exh. 111 at 179-182, ECF No. 22; *see also* Exh. 121bb, ECF No. 23-6.)

When the State used a peremptory challenge to dismiss Juror Dawson, the only other African American in the jury pool, defense counsel argued:

> Whipple: . . . it's my position that Mrs. Dawson was stricken, was preempted specifically because of her minority status, and I believe that they need to provide a race neutral reason other than that for Mrs. Dawson.

15

(Exh. 111 at 262, ECF No. 22.)

Deputy District Attorney Stanton responded:

Stanton: . . . Judge, the race neutral reasons for excluding Ms. Dawson are as follows. Ms. Dawson in her jury questionnaire answered question number 28, that is the question that deals with a family member or close friend being arrested or charged with a crime. And then the follow-up corollary question, "Do you believe that person was treated fairly by the judicial system." She answered, "Yes," to both of those questions in her written questionnaire on page six.

In her oral responses to my questions, she indicated, yes, that someone had been charged, that the charging of that was in the past year, that it was in the State of California, and indicated that the person was treated unfairly. That was inconsistent with her questionnaire.

And I indicate that there were two other jurors that were similarly situated in their responses to Question 28, that being family members charged that felt that they had been treated unfairly, Juror No. 841, Ms. Estrada, and Juror No. 897, Ms. Compton. Both of those jurors were excused by the State in the exercise of the peremptory challenges.

In addition, Ms. Dawson, in my questioning I was standing at eye level right across from her during the question about the family friend, or family member that was charged with a crime. In her responses, she made no eye contact with me, and was specifically looking at almost a 90-degree angle away from me in answering questions about whether or not she felt that individual was treated fairly, and the facts and circumstances regarding that. That, in itself, was something that I noted to [the other prosecutor] Mr. DiGiacomo as soon as I sat down and indicated my concerns about that particular juror. . . .

There was a series of questions that I asked the jurors about whether or not they could, as a juror, if selected as the foreperson, sign a verdict form in the guilt phase, and then I had a secondary followup as to whether or not they could do it in the penalty phase.

That's a critical question for me. I look at body language and eye contact, and once again, Ms. Dawson would not make eye contact when I pursued that question, or was asking that question.

Whipple: You Honor, I feel the appropriate record's been made. I submit it at this point. I do not believe that rises to the level of preempt, but I'll submit it at this point.

(Exh. 111 at 263-266, ECF No. 22; *see also* Exh. 121b, ECF No. 23-5.)

The state district court found that the State provided a sufficient race-neutral reason and declined to sustain the defense's challenge. (Exh. 111 at 266, ECF No. 22.)

16

1       The Nevada Supreme Court held that the record did not reflect that the State

2    discriminated against the two jurors on the basis of race:

> Cobb contends that the district court erred in overruling his objections pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), because the State exhibited discriminatory motive in using peremptory challenges to remove two African-American prospective jurors from the jury pool. In evaluating a *Batson* challenge, whether the State exhibited discriminatory intent is a determination of fact for the district court that this court "accord[s] great deference." *Diomampo v. State*, 124 Nev. 414, 422-23, 185 P.3d 1031, 1036-37 (2008) (quoting *Walker v. State*, 113 Nev. 853, 867-68, 944 P.2d 762, 771-72 (1997) (internal quotation marks omitted)). We will not reverse the district court's decision "unless clearly erroneous." *Kaczmarek v. State*, 120 Nev. 314, 334, 91 P.3d 16, 30 (2004).
>
> The district court denied Cobb's *Batson* challenges after determining that he failed to demonstrate purposeful discrimination by the State. Nothing in the record indicates that the State's reasons for excusing the two contested jurors were motivated by racial discrimination. Both potential jurors provided inconsistent answers in their juror questionnaires and during voir dire, and the son of one of the potential jurors had been prosecuted twice by the State. Such factors would be cause for concern from the State's perspective. Accordingly, we conclude that the district court's decision was not clearly erroneous in this instance, and reversal is not warranted on this issue.

(Exh. 156 at 3, ECF No. 25-5.)

       The State articulated specific, concrete reasons for striking the two jurors, including pointing to objective inconsistencies between the jurors' answers on the questionnaire and their responses in court. The first juror's son was prosecuted by the district attorney's office that was prosecuting Cobb. Prosecutor Stanton pointed to the second juror's strange, seemingly evasive posture when she answered his questions about a family member or friend's experience with the justice system. Cobb has not shown that the Nevada Supreme Court's decision on federal ground 1 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). Accordingly, the Court denies federal habeas relief on ground 1.

**B.    Ground 3**

Cobb argues that he was denied his right to have a jury venire selected from a fair cross-section of society in violation of the Fifth, Sixth, and Fourteenth Amendments because the composition of the jury pool did not adequately represent a fair cross section of the community. (ECF No. 17 at 31-33.)

Defendants are not entitled to juries of any particular composition. *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). The fair cross-section requirement applies to the larger venire pool and not to the petit jury. *See id*. A petitioner may demonstrate a violation of the Sixth Amendment right to an impartial jury trial by proving that the jury venire from which the petit jury was selected did not represent a fair cross-section of the community. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). A petitioner establishes a prima facie violation of the fair cross-section requirement by showing: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Id*. However, "a violation of the fair cross-section requirement cannot be premised upon proof of underrepresentation in a single jury. While juries must be drawn from a source fairly representative of the community, the composition of each jury need not mirror that of the community." *United States v. Mitchell*, 502 F.3d 931, 950 (9th Cir. 2007) (quoting *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir. 1985)).

Here, defense counsel made an oral motion to strike the jury venire pool due to the racial makeup of the pool. (Exh. 111 at 266, ECF No. 22.) Clark County Jury Commissioner Judy Rowland testified outside the presence of the jury on the ninth day of Cobb's trial. (Exh. 119 at 86-91, ECF No. 23.) She explained that at that time jurors were summoned through the Department of Motor Vehicles ("DMV"), so if you had a

18

driver's license or a license plate, you were selected. Rowland requests the list every year from the DMV, and the list contains over 1,600,000 names. In response to the State's questioning, she said she was not aware of any logistical problems or glitches in the system or the DMV rolls that would have caused any issues with the makeup of the panel group in this case. She stated that about 18% of the people summoned do not show up, and the racial or ethnic makeup of that group is not tracked. She testified that a bill was pending in the Nevada legislature to also summon jurors for the pool based on utilities bills. Rowland expressed hope that the bill would lead to a bigger and more diverse list. The trial court then denied the motion for a new jury panel. (*Id*. at 96-98.)

The Nevada Supreme Court concluded that Cobb failed to demonstrate that African Americans were systematically excluded from the jury pool:

> Cobb also argues that his constitutional rights were violated because his jury venire did not adequately represent a cross section of the community with regard to African Americans. The Sixth Amendment of the United States Constitution "requires that "'veniries from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."'" *Williams v. State*, 121 Nev. 934, 939-40, 125 P.3d 627, 631 (2005) (quoting *Evans v. State*, 112 Nev. 1172, 1186, 926 P.2d 265, 274 (1996) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975))). To show that his right to a fair cross section has been violated, a defendant must demonstrate:
>
> > "(l) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in veniries from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."
>
> *Id*. at 940, 125 P.3d at 631 (quoting *Evans*, 112 Nev. at 1186, 926 P.2d at 275) (internal quotation marks omitted) (emphases omitted)).
>
> Assuming arguendo that Cobb satisfied the first and second steps, we evaluate whether African Americans are systematically excluded from the Clark County jury selection process. At trial, Cobb examined the Clark County jury commissioner about the jury selection process. The jury commissioner testified that jurors are currently selected from a list provided by the Department of Motor Vehicles but that a senate bill was pending at that time that would expand the pool of potential jurors to include those who

19

are customers of Nevada Power.[FN1] This attempt to expand the juror list is Cobb's sole argument that minorities are systematically excluded from the juror pool. We conclude that Cobb's argument falls short of demonstrating systematic exclusion and, thus, Cobb has failed to show that his right to a venire selected from a fair cross section of the community was violated.

[FN1: There is no evidence in the record indicating whether the bill passed.]

(Exh. 156 at 4-5, ECF No. 156.)

While the Court recognizes the daunting nature of proving systematic exclusion, Cobb simply has not presented any evidence of such exclusion. The fact that a bill before the legislature might lead to use of utilities bills to also summon jurors, which might expand and diversify the jury pool does not show that the process in place to summon jurors systematically excluded minorities. Cobb has not demonstrated that the Nevada Supreme Court's decision on federal ground 3 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 3.

### C.    Ground 6

Cobb asserts that he was deprived of his right to confront the witnesses against him when the trial court improperly admitted Jorge Contreras's purported identification of Cobb as the shooter in violation of his Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 17 at 39-42.) Cobb was found not guilty of Contreras's murder.

A defendant must have an opportunity to confront witnesses against him. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004). Thus, testimonial evidence is inadmissible unless the witness is unavailable, and the defendant had a prior opportunity for cross-examination. (*Id.*) Over defense objection, and as set forth above in Section IV, Beatriz Hernandez testified that when Contreras regained consciousness he couldn't talk because he had a tube down his throat. (Exh. 114 at 54, ECF No. 22-3.) She asked

20

1    Contreras "[d]id Shady do this to you?" (*Id*. at 59.) Seemingly in response, Contreras lifted

2    one arm and pointed at her. Hernandez immediately left the hospital room and called the

3    police detective. The court asked several questions submitted by jurors, including if the

4    pointing was "to say that's right?" (*Id*. at 75.) Hernandez answered that Contreras was

5    "[s]aying that's right." (*Id*.)

6         The Nevada Supreme Court agreed that the statement was testimonial and

7    therefore inadmissible, but concluded that the admission of the statement was harmless

8    beyond a reasonable doubt because Cobb was acquitted of the charges related to the

9    shooting of Contreras:

> The second communication that Cobb argues was improperly admitted
> hearsay evidence relates to an incident that occurred while Contreras was
> in the hospital before he passed away. The district court permitted
> Hernandez to testify that Contreras was in the hospital for approximately
> one month and that she visited him almost daily during that time. On one of
> her visits, she asked Contreras "[d]id Shady do this to you," and, although
> he was unable to speak, Contreras "pointed at [her]." Hernandez testified
> that she immediately left Contreras's room to call the police. Cobb argues
> that the district court erred in admitting this hearsay communication in
> violation of his constitutional right to confrontation. We agree but conclude
> that the error was harmless beyond a reasonable doubt, *see Medina v.
> State*, 122 Nev. 346, 355, 143 P.3d 471, 4 76-77 (2006) (stating that
> harmless-error analysis applies to Confrontation Clause errors and that the
> error must be harmless beyond a reasonable doubt), thus reversal of
> Cobb's convictions is not warranted.
>
> A defendant's Sixth Amendment right to confront witnesses against him is
> not violated by the admission of statements that are not testimonial in
> nature. *Harkins v. State*, 122 Nev. 974, 979, 143 P.3d 706, 709 (2006).[FN2]
> Testimonial hearsay statements are only admissible under the Sixth
> Amendment if the declarant is unavailable and the defendant had an
> opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 68
> (2004). This court has enumerated several factors to be utilized in
> evaluating whether a statement is testimonial, including
>
> > (1) to whom the statement was made, a government agent or an
> > acquaintance;
> > (2) whether the statement was spontaneous, or made in response to
> > a question . . . ;
> > (3) whether the inquiry eliciting the statement was for the purpose of
> > gathering evidence for possible use at a later trial, or whether it
> > was to provide assistance in an emergency; and

(4) whether the statement was made while an emergency was ongoing, or whether it was a recount of past events.

*Harkins*, 122 Nev. at 987, 143 P.3d at 714. Here, Contreras's communication to Hernandez was not spontaneous but was instead prompted by her specific question. Additionally, there is no evidence in the record demonstrating that Hernandez's question and Contreras's response occurred in an emergent situation. At that time, Contreras had been in the hospital for over one week and his condition was improving. In addition, immediately after Contreras communicated his response to Hernandez, she left his hospital room to call the police, which appears to indicate that she was merely attempting to discover the identity of the shooter. Therefore, we conclude that Contreras's communication to Hernandez was testimonial in nature, rendering it inadmissible under *Crawford* because Cobb was not afforded the opportunity to cross-examine Contreras. Thus, we conclude that the district court abused its discretion in admitting this hearsay communication. However, we conclude that the error was harmless beyond a reasonable doubt as the jury acquitted Cobb on the charges stemming from the December 16 shooting of Contreras. *See Medina*, 122 Nev. at 355, 143 P.3d at 477 (concluding that erroneously admitted testimony was harmless because it did not contribute to the jury's verdict)

[FN2]: The State argues, among other things, that Hernandez's testimony is admissible under the dying declaration hearsay exception. *See* NRS 51.335. Statements admitted under the dying declaration hearsay exception do not violate a defendant's Sixth Amendment confrontation right. *Harkins*, 122 Nev. at 979, 143 P.3d at 709. We conclude that Contreras's communication with Hernandez was not admissible as a dying declaration because there is no evidence in the record to indicate that he believed he was going to die soon. *See* NRS 51.335 (providing that a dying declaration is "[a] statement made by a declarant while believing that his . . . death was imminent").

(Exh. 156 at 9-11, ECF No. 25-5.)

Defense counsel objected to this clear violation of Cobb's Sixth Amendment right to confront witnesses against him. But the jury found Cobb not guilty of shooting Contreras. No evidence was presented that Contreras had any involvement with or connection to the shooting of the Lopezes. The Nevada Supreme Court reasonably concluded that the error was harmless. Cobb cannot demonstrate that the Nevada Supreme Court's decision on federal ground 6 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the

22

1   state court proceeding. *See* 28 U.S.C. § 2254(d). The Court denies federal habeas relief

2   as to ground 6.

3          **D.      Ground 12**

4          Cobb argues that he was again (as in ground 6) denied his right to confront a

5   witness against him under the Fifth, Sixth, and Fourteenth Amendments when the trial

6   court admitted the preliminary hearing testimony of Angela Orozco. (ECF No. 17 at 54-

7   56.) Orozco was a friend of and fellow gang member with Cobb. Defense counsel argued

8   that the State did not make sufficient effort to locate Orozco. Clark County District Attorney

9   investigator William Falkner testified that he was asked to locate Orozco. (Exh. 112 at

10  189-199, ECF No. 22-1.) He found her on one occasion and spoke with her at her

11  residence. Falkner described her as hesitant, though she never refused to cooperate.

12  Orozco gave him her aunt's address as a way to contact her in the future. Falkner later

13  went to the aunt's address to serve a subpoena for Orozco to appear at Cobb's trial. The

14  aunt told him that she had not seen Orozco since Orozco's father had died and that

15  Orozco was essentially transient. Falkner went back to addresses that Orozco had been

16  known to frequent and showed her photo. He contacted apartment managers and

17  maintenance people, went to some homes and to businesses where the aunt told him

18  Orozco had been employed. No one could identify her. The state district court rejected

19  the defense challenge and found that the witness was unavailable. (*Id*. at 200.) Thus,

20  Orozco's preliminary hearing testimony was admitted. (Exh. 21 at 56-70, ECF No. 21.)

21  The preliminary hearing transcript reflects that counsel for Cobb cross-examined her,

22  including eliciting testimony that she was young and felt pressured at the time she had

23  made her statement to police. (*Id*. at 65-70.)[6]

24         The Nevada Supreme Court rejected this claim on direct appeal:

25         _____

26         [6]The State showed Orozco the statement she made to police at the time that she
           saw her brother, Cobb, and others passing around a bag of bullets in her house. When
           police searched the house, they found the two guns.

27                                              23

28

Cobb next contends that the district court erred in admitting the preliminary hearing testimony of Angela Orozco, who the State claimed was unavailable for trial, because "the State's effort to locate Ms. Orozco was not sufficient." A district court's decision to admit prior testimony of a witness whom the State is unable to locate presents a mixed question of law and fact. *Hernandez v. State*, 124 Nev. 639, 646-47, 188 P.3d 1126, 1131-32 (2008). This court "give[s] deference to the district court's findings of fact but will independently review whether those facts satisfy the legal standard of reasonable diligence." *Id*. at 647, 188 P.3d at 1132.

Prior testimony is admissible at trial "if three preconditions exist: first, that the defendant was represented by counsel at the preliminary hearing; second, that counsel cross-examined the witness; third, that the witness is shown to be actually unavailable at the time of trial." *Drummond v. State*, 86 Nev. 4, 7, 462 P.2d 1012, 1014 (1970); *see also* NRS 171.198, NRS 51.325. "[A] witness is not 'unavailable' . . . unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724-25 (1968); accord *Drummond*, 86 Nev. at 7-8, 462 P.2d at 1014.

A review of the record demonstrates that Cobb was represented by counsel at the preliminary hearing and that he effectively cross-examined Orozco. At trial, the State's investigator testified that in attempting to locate and subpoena Orozco, he visited her alleged place of employment and went to every residence to which he knew she had been linked. In addition, the investigator testified that he questioned Orozco's aunt about her whereabouts and was informed that she was transient. We conclude that the State's efforts to locate Orozco constituted good faith and reasonable diligence. *See Quillen v. State*, 112 Nev. 1369, 137 4-76, 929 P.2d 893, 897-98 (1996). Thus, we conclude that the district court did not err in determining that Orozco was unavailable and admitting her preliminary hearing testimony.

(Exh. 156 at 7-8, ECF No. 25-5.)

Cobb cannot show a *Crawford* violation. *See* 541 U.S. at 36. The State's investigator testified that he had pursued every lead he had to try to locate Orozco for trial, including going to every known address, speaking with family, going to businesses where she had worked or might have been working, and showing her photo at these places. Additionally, her aunt told him that Orozco was transient. The state district court reasonably ruled that Orozco was unavailable. Cobb's counsel at the preliminary hearing cross-examined Orozco. Cobb cannot demonstrate that the Nevada Supreme Court's holding on federal ground 12 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable

24

determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). Federal habeas relief is therefore denied as to ground 12.

## VI.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL CLAIMS

Federal courts address ineffective assistance of counsel ("IAC") claims under the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney "made errors so serious that he or she was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," and (2) "that the deficient performance prejudiced the defense." *Williams*, 529 U.S. at 3991 (quoting *Strickland*, 466 U.S. at 687)). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. at 391 (citation and internal quotation marks omitted). To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. (citation and internal quotation marks omitted). A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*. (citation and internal quotation marks omitted). Additionally, any review of the attorney's performance must be "highly deferential" and must adopt "counsel's perspective at the time" of the challenged conduct to avoid "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotation marks and citations omitted). When the IAC claim is based on a challenge to a guilty plea, the *Strickland*

25

1   prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability

2   that, but for counsel's errors, he would not have pleaded guilty and would have insisted

3   on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

4       If the state court has already rejected an IAC claim, a federal habeas court may

5   only grant relief if that decision was contrary to, or an unreasonable application of, the

6   *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong

7   presumption that counsel's conduct falls within the wide range of reasonable professional

8   assistance. *Id*.

9       The United States Supreme Court has described federal review of a state supreme

10  court's decision on a claim of ineffective assistance of counsel as "doubly deferential."

11  *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The

12  Supreme Court emphasized that: "We take a highly deferential look at counsel's

13  performance . . . through the deferential lens of § 2254(d)." *Id.* (citations and internal

14  quotation marks omitted). Moreover, federal habeas review of an IAC claim is limited to

15  the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S.

16  at 181-84. The United States Supreme Court has specifically reaffirmed the extensive

17  deference owed to a state court's decision regarding claims of ineffective assistance of

18  counsel:

19          Establishing that a state court's application of *Strickland* was unreasonable
            under § 2254(d) is all the more difficult. The standards created by *Strickland*
20          and § 2254(d) are both "highly deferential," *id*. at 689, 104 S.Ct. 2052; *Lindh
            v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997),
21          and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S.
            at 123. The *Strickland* standard is a general one, so the range of reasonable
22          applications is substantial. 556 U.S. at 124. Federal habeas courts must
            guard against the danger of equating unreasonableness under *Strickland*
23          with unreasonableness under § 2254(d). When § 2254(d) applies, the
            question is whether there is any reasonable argument that counsel satisfied
24          *Strickland's* deferential standard.

25

26

27                                              26

28

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (citations and internal quotation marks omitted). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotation marks and citations omitted).

### A.   Grounds 2 and 4 are procedurally defaulted

The remaining claims that trial counsel was ineffective with respect to the *Batson* challenge and the motion to strike the jury venire in grounds 2 and 4 are technically exhausted and procedurally barred. (ECF No. 110 at 16-17.) Cobb argues that he can establish cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012).

The court in *Coleman v. Thompson* had previously held that ineffective assistance of counsel in postconviction proceedings does not establish cause for the procedural default of a claim. 501 U.S. 722, 750 (1991). However, in *Martinez*, the court subsequently held that the failure of a court to appoint counsel, or the ineffective assistance of counsel in a state postconviction proceeding, may establish cause to overcome a procedural default in specific, narrowly-defined circumstances. 566 U.S. at 17. The court explained that *Martinez* established a "narrow exception" to the *Coleman* rule:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id*. In *Clabourne v. Ryan*, 745 F.3d 362 (9th Cir. 2014), the Ninth Circuit provided guidelines for applying *Martinez*, summarizing the analysis as requiring a demonstration of both cause and prejudice:

27

1
2
3
4
5

> First, to establish "cause," he must establish that his counsel in the state postconviction proceeding was ineffective under the standards of *Strickland* [*v. Washington*, 466 U.S. 668 (1984)]. *Strickland*, in turn, requires him to establish that both (a) post-conviction counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different. Second, to establish "prejudice," he must establish that his "underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."

6    *Clabourne*, 745 F.3d at 377 (citations omitted).

7                    **1.    Ground 2**

8    Cobb argues in the remaining portion of ground 2 that his trial counsel was

9    ineffective for failing to object when the trial court dismissed the second African American

10   prospective juror (Dawson) before holding a hearing to assess whether the prosecutors

11   dismissed her with discriminatory intent. (ECF No. 17 at 30-31.)

12   During jury selection, when the State exercised its fifth peremptory challenge,

13   defense counsel asked for a sidebar conference. (Exh. 111 at 203-04, ECF No. 22.) The

14   state district court then went back on the record and said: "The record should reflect the

15   defense made a timely motion which I will address outside the presence of the jury after

16   your fifth peremptory challenge." (*Id.* at 204.) After the court read the names of the

17   selected jurors and thanked and excused everyone else, the court stated: "All peremptory

18   challenges having either been exercised or waived, and understanding there's a motion

19   by the defense, which is going to be entertained outside the presence of the jury, at the

20   next available opportunity, which is in about three minutes, at this time I'm going to ask

21   you all to stand, raise your right hand." (*Id.* at 207.) After swearing in the jury, and outside

22   their presence, the court revisited the peremptory challenge:

23
24
25
26

> Court: The record should reflect that you timely asked to approach the bench the millisecond that the State exercised as their fifth peremptory challenge a peremptory challenge against Badge No. 639, Dawson, an African American female, by her own description. And the defense asked to approach and outside in the hallway said that you wanted to raise this challenge.

27                                        28

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> You also agreed that we could make a record in great detail at the next available opportunity, which is now, about that challenge that you made at sidebar. Please go ahead.
>
> Whipple: That's correct, Your Honor.

(*Id*. at 225.) As discussed above in ground 1, the district court concluded that the State proffered a race-neutral reason to dismiss Dawson and rejected the defense's challenge. (*Id*. at 262-266.)

While Cobb did not present this claim in his state postconviction proceedings, he insists that he can establish cause and prejudice to excuse the procedural default. He must therefore demonstrate cause, *i.e.* that postconviction counsel was ineffective for failing to raise this claim and there was a reasonable probability that the outcome of postconviction proceedings would have been different, and prejudice, *i.e.* that the underlying ineffective assistance claim is substantial.

Cobb fails to show that the underlying ineffective assistance of trial counsel claim is substantial. The state district court heard defense counsel's arguments as to Juror Carter before dismissing her, including inconsistencies between her answers on the questionnaire and her responses in court and the fact that her son had been prosecuted by this district attorney's office. The State then also articulated specific, concrete reasons for striking Juror Dawson—discrepancies between her questionnaire answers and responses in court as well as the prosecutor's claim of their observation as to her body language and lack of eye contact when questioned about a family member or friend's experience with the justice system. Though the court briefly deferred consideration of the defense challenge to the preemption of Dawson, the court had already considered and rejected the *Batson* challenge as to Carter. The State's rationales for preempting the two jurors were similar, and the State's proffered reasons for striking Dawson were at least as strong as those they presented as to Carter. There is no reasonable probability that trial counsel objecting to the court's brief delay in hearing his arguments with respect to

29

1   Dawson would have led to a different outcome.[7] Ground 2 is not substantial, and it is

2   procedurally barred from federal habeas review.

3               **2.      Ground 4**

4        Cobb insists his trial counsel was ineffective for failing to object to the trial court's

5   effective denial of his motion to strike the jury venire after an evidentiary hearing was

6   granted but before conducting the hearing in violation of the Fifth, Sixth, and Fourteenth

7   Amendments. (ECF No. 17 at 34-35.)

8        Defense counsel made an oral motion to strike the jury venire. (Exh. 111 at 266,

9   ECF No. 22.) The court stated that the motion would remain pending and that defense

10  counsel had indicated he would like to have the State consider incorporating in the trial a

11  previous examination of the jury commissioner as to the process of summonsing a jury

12  pool, and what the specific process is in Clark County. The court continued:

13       Court: I asked you at the bench to provide whatever it is that you want to
         incorporate into this record. To this date, I'll give them notice and

14       opportunity to be heard. If they agree, and that's what you want, then I'll
         incorporate that into the record, and I'll consider it with your pending motion.

15

16       If they won't agree and we need to have live testimony because they want
         the opportunity to ask Judy Rowland, jury commissioner, more questions
         on cross, or—I would certainly consider that. So that issue is pending.

17

18       If you would please present whatever it is you wish to present to the Court,
         to the State first for their consideration, I would appreciate it.

19  (*Id*. at 266-267.)

20       As discussed above in ground 2, the jury commissioner testified outside the

21  presence of the jury. (Exh. 119 at 86-91, ECF No. 23.) The court suggested that the

22  defense argue the motion regarding the jury pool after the lunch break they were about

23  to take. (*Id*. at 96.) Counsel informed the court that he was not going to offer further

24  argument and submitted the motion. The court denied the motion. (*Id*.)

25  _____

26       [7]Nor is there a reasonable probability that if state postconviction counsel had
    raised this claim that the outcome of postconviction proceedings would have been
    different.

27                                         30

28

1    Cobb again fails to demonstrate that this ineffective assistance of trial counsel

2    claim is substantial. First, the parties were working on whether they would incorporate

3    prior testimony by the jury commissioner or whether she would need to testify in these

4    proceedings. The court ultimately heard her live testimony. Again, showing systematic

5    exclusion of African Americans from the jury pool would be difficult in any event. But even

6    though the argument on the motion occurred later during the trial, no evidence was

7    presented to support systematic exclusion. (*See id*. 119 at 86-91.) Cobb cannot show

8    there was a reasonable probability that trial counsel objecting to the deferral of the

9    decision on his oral motion to strike the jury venire pool would have led to a different

10   outcome.[8] Ground 4 is not substantial, and it is procedurally barred from federal habeas

11   review.

12    **B.    Remaining IAC claims**

13        **1.    Ground 8**

14    Cobb alleges that trial counsel was ineffective for failing to adequately investigate

15   Juan Lopez Jr. who would have testified that Cobb did not shoot him or his father, in

16   violation his Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 17 at 45-47.)

17    As discussed above, the State subpoenaed Lopez, who was incarcerated at the

18   time in California, to testify at trial. (Exh. 113 at 14-29, ECF No. 22-2.) On the stand he

19   said that he did not remember much about when he and his father were shot. The court

20   permitted the prosecutor to treat Lopez as an adverse witness and ask him leading

21   questions about a previous deposition and statements Lopez gave to police seven years

22   earlier contemporaneously with the shootings. Lopez claimed that he did not remember

23   telling police that he had just left a convenience store with his dad when a white Astro van

24   pulled up and an individual who was Black and white (mixed-race) and dark-skinned,

25        [8]As with ground 2, Cobb has not shown a reasonable probability that if state
26   postconviction counsel had raised this claim that the outcome of postconviction
     proceedings would have been different.

27                                                        31

28

wearing a Dallas Cowboys hat and blue and white jacket, got out of the passenger seat. The prosecutor asked Lopez if he remembered when the van driver asked him and his father where they were from—meaning their gang affiliation—and that after they answered him the passenger, without saying anything, then fired numerous shots at the pair. He also asked Lopez if he recalled telling a police officer after Lopez had been shot several times that it was the 28th Street gang who shot him. Lopez denied remembering the events. He acknowledged that he had been in prison much of the time since 2000. He answered affirmatively when the prosecutor asked him if he recalled testifying at an earlier deposition (when he was arrested as a material witness) that people who testify in prison are snitches. He denied on the stand knowing what happens to snitches in prison. (*Id*. at 28-29.)

About five years later, in September 2012, Lopez testified at Cobb's state postconviction evidentiary hearing for his first state habeas petition that on the night in question a white Astro van approached him. (Exh. 185 at 16-25, ECF No. 185.) Someone exited from the opposite side of the van from the driver's side and began shooting at Lopez. He said he was already familiar with Cobb and that Cobb was not the person who shot him. He acknowledged that at Cobb's trial he had testified that he did not see the shooter. He did not identify Cobb in a photo lineup at the time. Lopez said that law enforcement had told him at the time that they believed that Cobb was the shooter. While Lopez testified at the evidentiary hearing that he was certain at the time of the incident that Cobb was not the shooter, he never told police that and said "I don't know" when asked why he did not. (*Id*. at 17.) Lopez explained that eleven years after the shootings he swore an affidavit that Cobb did not shoot him or his father and testified that he was positive it was not Cobb. Lopez testified that the shooter was Hispanic. His explanation was that he told police at the time that the shooter was a Black male who had been sitting in the passenger seat because it was dark, and he couldn't really see. He was asked if

32

1    he was lying on the two separate occasions when he told police it was a Black male in

2    the passenger seat of the van, and he responded, "I guess I was." (*Id*. at 19, 20.) Under

3    questioning from the court, Lopez acknowledged that the state postconviction evidentiary

4    hearing, thirteen years after the shooting, was the first time he had told anyone that a

5    Hispanic man was the shooter.

6        The Nevada Supreme Court concluded that counsel was not unreasonable in not

7    investigating Lopez, Jr.:

8        [A]ppellant argues that counsel was ineffective for failing to conduct a
         pretrial interview of victim J. Lopez, Jr. Appellant has failed to demonstrate
9        deficiency or prejudice. Appellant has not shown that counsel was
         objectively unreasonable in not interviewing a victim who repeatedly told
10       police that he could not remember details of the shooting and who did not
         identify appellant in a photographic lineup. At trial, the victim maintained that
11       he could not remember, and at the evidentiary hearing for the instant
         petition, the victim testified that at the time of trial he felt that the best way
12       to help appellant was to continue to maintain that he could not remember.
         We therefore conclude that the district court did not err in denying this claim.
13

14   (Exh. 206 at 3-4, ECF No. 28-5.)

15       This claim is meritless. Lopez was not credible at trial when he testified to not

16   remembering anything about the shooting. He was not credible at the state postconviction

17   evidentiary hearing when he said for the first time that Cobb was not the shooter. Cobb

18   hasn't explained what interviewing a victim who claimed to not remember events and

19   never identified Cobb in a photo lineup would have yielded. He has not demonstrated that

20   the Nevada Supreme Court's decision was contrary to, or involved an unreasonable

21   application of, *Strickland*. *See* 28 U.S.C. § 2254(d). Ground 8 is denied.

22               **2.    Ground 9**

23       Cobb contends that trial counsel was ineffective for failing to object to the testimony

24   of David Hollis, an expert witness the State failed to properly notice, in violation of his

25   Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 17 at 47-51.)

26

27                                  33

28

1    The Nevada Supreme Court concluded that Cobb failed to show counsel was

2  ineffective:

3       [A]ppellant argues that counsel was ineffective for failing to object to the
        expert testimony of a witness who had not been noticed as an expert.
4       Appellant has failed to demonstrate deficiency or prejudice. Appellant did
        not ask counsel about this witness at the evidentiary hearing nor
5       demonstrate that it was objectively unreasonable for counsel to refrain from
        objecting to testimony that is only questionably expert in nature. Further, the
6       allegedly expert testimony to which appellant now objects had already
        largely been admitted via other witnesses such that he could not
7       demonstrate a reasonable probability of a different outcome at trial had the
        testimony been excluded. We therefore conclude that the district court did
8       not err in denying this claim.

9  (Exh. 206 at 5, ECF No. 28-5.)

10    The record supports the state supreme court's observation that the gang dynamics

11  to which Hollis testified, as well as the circumstances around Cobb's membership in 28th

12  Street, his arrest, and the discovery of the butt plate of a rifle in a shed adjacent to Cobb's

13  home, generally came into evidence through other witnesses, particularly law

14  enforcement. Rather than expert testimony, Hollis's testimony is more accurately

15  characterized as, for the most part, his experiences with Las Vegas gangs at the time in

16  question, his work as a youth parole officer, and his personal interactions with Cobb. Cobb

17  hasn't shown deficiency or prejudice with respect to Hollis's testimony. Cobb has not

18  demonstrated that the Nevada Supreme Court's decision on ground 9 was contrary to, or

19  involved an unreasonable application of, *Strickland*, or was based on an unreasonable

20  determination of the facts in light of the evidence presented in the state court proceeding.

21  *See* 28 U.S.C. § 2254(d). The Court therefore denies federal habeas relief on ground 9.

22          **3.    Ground 10**

23    Cobb insists that trial counsel ineffectively failed to request a spoliation of evidence

24  instruction, in violation of the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 17 at

25  52-53.) Metro detective William Nellis testified that the police did not test the guns for

26  fingerprints. (Exh. 115 at 27, ECF No. 22-4.) Cobb pleaded guilty to and testified at trial

27                                          34

28

1
2
3
4
5
6

to using the rifles recovered by police in the other two shootings. Fellow 28th Street gang member Jose Devora testified for the defense that at the time in question guns were passed around by the gang. (Exh. 117 at 107-108, ECF No. 22-6.) Martin Jankowski, a sociology professor, testified for the defense about gangs and gang culture. (*Id*. at 69-89.) In particular, Jankowski testified that gangs share drugs and alcohol and weapons including guns, knives, and brass knuckles. (*Id*. at 78.)

7
8

The Nevada Supreme Court reasoned that Cobb failed to show deficiency or prejudice:

9
10
11
12
13
14
15

> [A]ppellant argues that counsel was ineffective for failing to request that the jury be instructed that it must presume the two murder weapons lacked appellant's fingerprints because the State failed to test the murder weapons for fingerprints. Appellant has failed to demonstrate deficiency or prejudice. Appellant admitted at trial to handling, and was previously convicted of crimes involving the discharge of, one of the firearms, and he was acquitted of the crime involving the other firearm. Thus a lack of prints would not have exculpated him. Further, two defense witnesses, one of whom was a former member of appellant's gang, testified that gang members passed guns among themselves, and accordingly, the presence of prints other than appellant's would also not have been exculpatory. We therefore conclude that the district court did not err in denying this claim.

16

(Exh. 206 at 4, ECF No. 28-5.)

17
18
19
20
21
22
23
24
25

Defense witnesses testified that gangs in general, and the 28th Street gang in particular, passed guns around for each other to use. Cobb testified that he had handled and used the weapons in question. The absence of Cobb's fingerprints or presence of other fingerprints on the guns would not have been probative of anything, let alone exculpatory. Cobb cannot show that the Nevada Supreme Court's decision that defense counsel was not ineffective for failing to request a spoliation instruction was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 10.

26

///

27

35

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.     Ground 11

Cobb argues that trial counsel ineffectively failed to object to the hearsay testimony of Angel Melendez, in violation of his Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 17 at 53-54.) (*See* Melendez testimony above, at Section IV.) Melendez was present at the Silva shooting.

State law prescribes that if a declarant testifies at trial, is cross-examined concerning their prior statement, and their prior statement is inconsistent with their trial testimony, counsel can move to admit their prior statement into evidence as a prior inconsistent statement. NRS §§ 50.135, 51.035(2)(a).

The Nevada Supreme Court held that the testimony was not hearsay:

> [A]ppellant argues that counsel was ineffective for failing to object to the hearsay testimony of A. Melendez, which allegedly portrayed him as a violent man with criminal tendencies. Appellant has failed to demonstrate deficiency or prejudice. The testimony of the witness, who was subject to cross-examination, was elicited as a prior inconsistent statement, which is excluded from the definition of hearsay. *See* NRS 51.035(2)(a). Further, appellant had pleaded guilty to the crime about which the witness was testifying, which included an enhancement for gang activity. We therefore conclude that the district court did not err in denying this claim.

(Exh. 206 at 4-5, ECF No. 28-5.)

In pre-trial motion practice, defense counsel in fact litigated the admissibility of the Silva shooting, asserting that the unfair prejudice of the prior bad act substantially outweighed the probative value. (Exh. 47, ECF No. 20; Exh. 50, ECF No. 20-3; Exh. 66, ECF No. 20-19.) Defense counsel continued to object to the admission of the prior inconsistent statement at trial. (Exh. 112 at 112, ECF No. 22-1; Exh. 114 at 7-14, 93-94, ECF No. 22-3.) This Court agrees that Cobb has not shown deficiency or prejudice. Melendez was a reluctant trial witness, and thus the State delved into his prior inconsistent statements. Cobb never denied being a gang member, pleaded guilty to shooting Silva, and testified at trial that he indeed shot Silva. He has not demonstrated that the Nevada Supreme Court's decision that defense counsel was not ineffective for

36

1  lodging what would have been a futile hearsay objection to Melendez's testimony was

2  contrary to, or involved an unreasonable application of, *Strickland*, or was based on an

3  unreasonable determination of the facts in light of the evidence presented in the state

4  court proceeding. *See* 28 U.S.C. § 2254(d). The Court denies federal habeas relief on

5  ground 11.

6          **5.    Ground 14**

7          Finally, Cobb argues that the cumulative effect of the ineffective assistance of his

8  trial counsel violated his Fifth, Sixth, and Fourteenth Amendment rights and warrants

9  reversal. (ECF No. 17 at 57-58.) "[T]he combined effect of multiple trial court errors

10  violates due process where it renders the resulting criminal trial fundamentally unfair."

11  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). "The cumulative effect of multiple

12  errors can violate due process even where no single error rises to the level of a

13  constitutional violation or would independently warrant reversal." *Chambers v.*

14  *Mississippi*, 410 U.S. 284, 290 n.3 (1973).

15          The Nevada Supreme Court held that Cobb did not demonstrate any errors by

16  counsel to cumulate. (Exh. 206 at 6, ECF No. 28-5.) This was a reasonable determination

17  because Cobb did not show deficiency and prejudice as to any of his ineffective

18  assistance claims. He has not demonstrated that the Nevada Supreme Court's decision

19  that there was no error to cumulate was contrary to, or involved an unreasonable

20  application of, *Strickland*, or was based on an unreasonable determination of the facts in

21  light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

22  Habeas relief is denied on ground 14.

23          Cobb's Petition, therefore, is denied in its entirety.

24  **VII.   CERTIFICATE OF APPEALABILITY**

25          This is a final order adverse to the petitioner. As such, Rule 11 of the Rules

26  Governing Section 2254 Cases requires this Court to issue or deny a certificate of

27                                          37

28

appealability ("COA"). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court's procedural ruling was correct. *Id*. Having reviewed its determinations and rulings in adjudicating Cobb's Petition, and applying these standards, the Court finds that a certificate of appealability is unwarranted.

## VIII.   CONCLUSION

It is therefore ordered that Petitioner Cobb's petition for a writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 17) is denied.

It is further ordered that a certificate of appealability will not issue.

The Clerk of Court is directed to substitute W.A. Gittere for Respondent E.K. McDaniels, enter judgment accordingly, and close this case.

DATED THIS 11th Day of October 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

38